U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



**United States Bankruptcy Judge**

**Signed July 28, 2010**

---

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES T. THRASH and | § | Case No. 99-46344-DML-13 |
| KIMBERLY K. THRASH, | § | |
| | § | |
| Debtors. | § | |
| JAMES T. THRASH and | § | |
| KIMBERLY K. THRASH, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 09-04142 |
| | § | |
| OCWEN LOAN SERVICING, LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (2) DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

THE HONORABLE STACEY G.C. JERNIGAN, SITTING FOR THE HONORABLE D. MICHAEL LYNN:

Before this court are cross motions for partial summary

1

judgment, responses, replies, and supporting documentary evidence in the above-referenced adversary proceeding ("Adversary Proceeding").[1] The Adversary Proceeding involves allegations by former Chapter 13 Debtors, James and Kimberly Thrash ("Mr. Thrash," "Mrs. Thrash," and together, the "Plaintiffs"), of unlawful and improper conduct by Ocwen Loan Servicing, LLC (the "Defendant") in servicing the Plaintiffs' home mortgage loan.[2] For the reasons set forth below: (1) Defendant's MSJ is granted in part and denied in part (the motion is **granted** as to Counts One, Four, Five, Six and Seven, and is **denied** as to Count

---

[1] Specifically, the court refers to: (a) Ocwen's Motion for Partial Summary Judgment and Brief in Support Thereof, along with Declaration of Danielle N. Oakley in Support of Ocwen's Motion for Summary Judgment and Exs. A-I [Doc. No. 96 in the Adversary Proceeding] (hereinafter, "Defendant's MSJ," with exhibits referred to as "Def. Ex. ___"); (b) Plaintiffs' Response in Opposition to Ocwen's Motion for Partial Summary Judgment, along with Exs. A-S [Doc. No. 98 in the Adversary Proceeding] (hereinafter, "Plaintiffs' Response to MSJ," with exhibits referred to as "Pls. Ex. ___"); (c) Ocwen's Reply in Support of its Motion for Partial Summary Judgment [Doc. No. 100 in the Adversary Proceeding] (hereinafter "Defendant's Reply"); (d) Plaintiffs' Motion for Partial Summary Judgment as to Plaintiffs' Claims Alleging Violations of the Automatic Stay and Contempt and Incorporated Brief in Support, along with Exs. A-F [Doc. No. 94 in the Adversary Proceeding] (hereinafter, "Plaintiffs' Cross MSJ," with exhibits referred to as "Pls. Cross Ex. ___"); and (e) Ocwen Loan Servicing, LLC's Opposition to Plaintiffs' Motion for Summary Judgment as to Plaintiffs' Claims Alleging Violations of the Automatic Stay and Contempt, along with Ex. 1 [Doc. No. 99 in the Adversary Proceeding] (hereinafter "Defendant's Response to Cross MSJ," with exhibit referred to as "Def. Cross Ex. ___").

[2] The court uses the colloquial term "home mortgage loan" throughout this opinion to refer to the secured borrowing arrangement in place between the Plaintiffs and Defendant. Deeds of Trust (with promissory notes) are typically the instruments used in the state of Texas (rather than "mortgages") to grant lenders security interests in borrowers' homes. The technical differences, for purposes of this opinion, are irrelevant.

Twelve); and (2) Plaintiffs' Cross MSJ (as to Counts Two and
Three) is **denied** entirely.  The Adversary Proceeding will proceed
to a trial on the merits on the counts unresolved by this
Memorandum Opinion and Order (*i.e.,* Counts Two, Three, Eight,
Ten, and Twelve).[3]

## I.  UNDISPUTED FACTS

The Plaintiffs filed a Chapter 13 bankruptcy case on
December 6, 1999.  Pls. Ex. A.  An order confirming the
Plaintiffs' plan of rehabilitation was entered on August 28,
2000.  The Plaintiffs eventually obtained a discharge in their
Chapter 13 case, on July 13, 2004, after completion of their
plan.

The Plaintiffs have, at all relevant times, owned and
resided at a home at 4902 Oldfield Drive, Arlington, Texas 76016
("Homestead").  The Homestead is the subject of this Adversary
Proceeding.  The Plaintiffs are obligated on a mortgage loan on
the Homestead, and the mortgage loan has been serviced by
Defendant at all relevant times.  Plaintiffs argue in this
Adversary Proceeding that Defendant has wrongly applied and/or

---

[3] Count Eleven (which was presented/briefed in the Defendant's
MSJ) has apparently been previously dismissed.  The following
additional counts asserted in the Plaintiffs' Complaint were not
presented in the cross motions for summary judgment: Count Eight—
Injunctive Relief (stop foreclosure); Count Nine—Violations of Fair
Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (now
dismissed); and Count Ten—Violations of Chapter 392—Texas Financial
Code.

accounted for payments made by the Plaintiffs on their mortgage loan both postpetition and post-discharge, has overstated the amount Plaintiffs owe on their mortgage loan post-discharge and, ultimately, has wrongfully attempted to foreclose on the Homestead. The more specific facts are that, during the Chapter 13 case, the Defendant timely filed a proof of claim, on or about January 6, 2000, asserting $10,470.52 in prepetition arrearages on the mortgage loan (which included, among other things, an escrow deficiency and late charges). Def. Ex. C. The Plaintiffs objected to this proof of claim, alleging that there were unreasonable and unauthorized charges asserted therein. Def. Ex. D. The proof of claim was, on August 28, 2000, disallowed in part ($4,492.52 was disallowed for improper escrow arrearages and certain other improper charges), and allowed in part, in the amount of $5,978. Def. Ex. E. Soon thereafter, on November 20, 2000, an Agreed Order Relative to the Automatic Stay of 11 U.S.C. § 362 ("Agreed Stay Order") was entered in the case, resolving a motion to lift stay that was filed by the Defendant. The Agreed Stay Order provided that the Plaintiffs had become delinquent on three **post**petition payments (August-October 2000), resulting in a postpetition delinquency on their mortgage loan of $3,793.09, and that the automatic stay of their bankruptcy case would remain in place so long as the Plaintiffs cured this arrearage over six months (at $632.19 per month, commencing on November 15, 2000,

4

with each payment due on the 15th day of the month thereafter),
and also kept current on their regular mortgage payments which
they were direct-paying (such mortgage payments being $1,170.20
per month, subject to periodic adjustments), as well as on their
regular plan trustee payments.  Pls. Ex. I.  Three and-a-half
years later, on June 14, 2004, the Defendant filed a Notice of
Termination of Stay, claiming that the Plaintiffs had defaulted
with regard to their postpetition direct-pay mortgage payments on
certain occasions (the only details given in this Notice of
Termination were that demands were made on the Plaintiffs by
letters dated March 19, 2001, May 29, 2001 and November 7,
2003),[4] that the Plaintiffs had "again defaulted in connection
with Debtor's [sic] payment of the post-petition installments
and/or postpetition arrearage installments outside the plan" and
had further "failed to cure said arrears within the specified
time frame stated in said default letter," and that the automatic
stay was terminated by operation of the November 20, 2000 Agreed
Order.  Doc. No. 48 in bankruptcy case.  As earlier noted, the
Plaintiffs obtained a discharge on July 13, 2004 (less than a
month *after* this Notice of Termination of Stay from Defendant),
and, on December 10, 2004, the Chapter 13 Trustee filed a final
report indicating that the Plaintiffs had completed their Chapter

---

[4] The summary judgment evidence is somewhat inconsistent on
whether these were the correct dates of such demand letters.  *Compare*
Pls. Ex. J.

13 plan, including payment of all prepetition mortgage arrearages. The June 14, 2004 Notice of Termination of Stay was followed with a June 15, 2004 Letter/Notice of Default from the Defendant, reflecting a *$21,207.36* arrearage (inclusive of $10,381.31 of past due principal and interest and $9,683.96 for escrow, plus various other charges), and then a June 18, 2004 Letter/Notice of Default, reflecting a *$20,466.95* arrearage (inclusive of $9,560.14 of past due principal and interest and $9,683.96 for escrow, plus various other charges). Pls. Exs. J & K.

From June 2004 through early 2009, there were numerous communications (written and telephonic) among the Plaintiffs and Defendant, regarding the Plaintiffs' alleged postpetition default. Plaintiffs appear to have made repeated requests for information regarding what payments Defendant believed had been missed under the mortgage loan. The Plaintiffs believed the Defendant had somehow not accounted for or had misapplied payments or were overcharging Plaintiffs. The Plaintiffs had made postpetition payments *via* Western Union and allege that they were trying to avoid significant charges for obtaining prior payment records from Western Union. Defendant allegedly was not helpful and/or indifferent with regard to the Plaintiffs' requests. On July 13, 2004, the Defendant sent Mrs. Thrash a letter informing the Plaintiffs that it was Plaintiffs'

6

responsibility to provide evidence to Defendant of a
misapplication of payments.  By December 12, 2008, in a letter
from the Defendant to Plaintiffs, Defendant claimed Plaintiffs
owed **$27,499.65**.  All the while, Plaintiffs have asserted they
have made every required mortgage loan payment since completing
their plan and receipt of the original June 14, 2004 Notice of
Termination of Stay.  Ultimately, the Defendant noticed a
foreclosure, which led to this Adversary Proceeding being filed.

     With regard to the Plaintiffs' assertions that there were
misapplications of postpetition loan payments by Defendant,
inappropriate charges made, and other misdeeds undertaken, at
least the following events appear from the summary judgment
evidence to have occurred, and—according to the Plaintiffs—such
actions were without authority from the loan documents, the
bankruptcy court, the Bankruptcy Code or otherwise:

>          (a) the Defendant—consistent with its
>          corporate policy, whenever there is a
>          bankruptcy case in which postpetition
>          mortgage payments are paid *directly* by
>          debtors—accrued "late fees" every month,
>          during the term of Plaintiffs' bankruptcy
>          plan, even if the Plaintiffs made their plan
>          payments and their regular postpetition
>          mortgage payments on time (or even early),
>          since the Plaintiffs were technically not
>          "contractually current" (according to the
>          deposition testimony of Defendant's Rule
>          30(b)(6) representative, this policy of
>          accruing "late charges" is in place because
>          so many chapter 13 debtors default on their
>          plans and have their cases dismissed and, in
>          such events, the Defendant would "have to go
>          back and do a lot of accounting and reverse

7

all of that . . .which can get pretty confusing I would think");[5]

(b) the Defendant arguably did not properly account for the bankruptcy filing in its bookkeeping—for example, by continuing to carry disallowed components of its proof of claim on its books through the bankruptcy case and thereafter, and, thus, always showing the Plaintiffs to be behind in their payments;[6]

(c) the Defendant erroneously applied, on November 18, 2002, $1,918.23 worth of **post**petition mortgage payments paid in by the Plaintiffs to Plaintiffs' negative "escrow account" which was negative (at least in large part) due to **pre**petition arrearages that had been disallowed by the bankruptcy court in connection with Plaintiffs' objection to the Defendant's proof of claim;

(d) the Defendant erroneously applied, on December 31, 2002, $889.82 worth of **post**petition mortgage payments paid in by the Plaintiffs to Plaintiffs' negative "escrow account" which was negative (at least in large part) due to **pre**petition arrearages that had been disallowed by the bankruptcy court in connection with Plaintiffs' objection to the Defendant's proof of claim;

(e) the Defendant sometimes applied Plaintiffs' regular postpetition mortgage

---

[5] It appears that there may be a procedure (when there is a discharge of a debtor) to perform a post-discharge audit or reconciliation and "reverse out" these late charges, but it was not undertaken in this case, since the automatic stay was terminated one month **prior** to the Plaintiffs' discharge. See Pls. Ex. B, Deposition of Gina Johnson, p. 44.

[6] *See* Pls. Ex. B, Deposition of Gina Johnson, p. 13. *See also* footnote 5, *supra*. No post-discharge audit/reconciliation to eliminate prepetition claims that were disallowed was ever done in this case, since the automatic stay was lifted in favor of the Defendant one month **prior** to the Plaintiffs' discharge.

8

payments to principal and interest and
sometimes posted them in a "suspense account"
or applied them to "other charges" (the
interpretation of this by Plaintiffs being
that the Defendant was utterly inconsistent
in its applications-methodology and that its
practices, in fact, defied logical
explanation; the explanation of the Defendant
is that the Plaintiffs sometimes sent in
postpetition payments in the ***wrong
amount***—perhaps because the Plaintiffs had a
fluctuating "ARM" note—and, when the
Plaintiffs sent in a payment in the wrong
contractual amount,[7] the Defendant put the
payment in a "suspense account" until the
Plaintiffs had paid in the correct full
amount that could be applied);

(f) because of postpetition payments being
occasionally put in a "suspense account," there
would be deemed-delays in payment, and this
resulted in yet more late charges, which
Plaintiffs claim were unmerited or disingenuous;

(g) the Defendant sometimes escrowed amounts for
taxes and insurance when the mortgage loan did not
contemplate this, and when the Plaintiffs
allegedly have always paid taxes and insured the
Homestead directly (the Plaintiffs, allegedly,
have a special payment plan set up with the taxing
authorities, due to Mr. Thrash being disabled);
and

(h) the Defendant coded the Plaintiffs' account so
that broker price opinions were ordered roughly
every six months at a cost of more than $100 each,
and Plaintiffs argue that this was unwarranted.

The gist of all of this, Plaintiffs argue, is that the

Defendant's actions were tortious in many regards, violated the

_____

[7] The Plaintiffs' mortgage loan was an adjustable rate mortgage
note, and the regular mortgage payment was $956.44 until September
1999, when it increased to $1,130.07 (and it adjusted thereafter from
time to time).

automatic stay (*e.g.*, by applying postpetition payments to disallowed prepetition amounts), violated the discharge order (*e.g.*, by significantly overstating amounts on certain post-discharge notices, due to wrongly applying postpetition payments to prepetition amounts and wrongly assessing late charges and the like), and were contemptuous.  The Plaintiffs also allege that collection efforts undertaken by Defendant were unreasonable and tortious (because of phone calls in which demeaning and discourteous comments were made, along with yelling).

As always, there are two sides to every story.  In this Adversary Proceeding, the Defendant acknowledges that, due to an internal servicing error (and/or the business policies of the Defendant), it inadvertently: (a) misallocated two postpetition direct-mortgage payments on November 18, 2002 and December 31, 2002; and (b) failed to complete its normal bankruptcy accounting reconciliation upon discharge, and, thus, continued to include amounts disallowed during the bankruptcy case (through the sustained objection to its proof of claim)—thus overstating amounts owed on certain post-discharge notices of default. However, Defendant is adamant that payments made by the Debtor postpetition and/or post-discharge were not always in the correct amounts, due most likely to the floating interest rate applicable to the mortgage loan, and this is the reason for the "suspense accounts" that were used on a frequent basis.  Additionally, the

10

Defendant argues that there were, in fact, delinquent taxes on occasion, and the Defendant did (and was within its rights to) pay delinquent taxes and then assess these against Plaintiffs. Defendant denies that its collection efforts were ever unreasonable—pointing out that there are no allegations or evidence of calls at inappropriate hours, calls to work places, or inappropriate threats.

## II. JURISDICTION

This court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b).[8]  This Adversary Proceeding involves a mixture of core and non-core claims, pursuant to 28 U.S.C. § 157(b).  The parties have ultimately consented to the bankruptcy court issuing final orders as to the non-core claims.[9]

---

[8] While this Adversary Proceeding involves Plaintiffs whose bankruptcy case ended many years ago, the Fifth Circuit has concluded in different contexts over the years that bankruptcy subject matter jurisdiction remains post-confirmation, and even after a bankruptcy case is closed, for such matters as enforcing/interpreting the scope of a debtor's discharge order and addressing alleged violations of it. *See, e.g., Bradley v. Barnes (In re Bradley)*, 989 F.2d 802 (5th Cir. 1993).

[9] The Defendant filed a motion for the district court to withdraw the reference of this Adversary Proceeding on September 28, 2009 [Doc. No. 47] (the "Motion to Withdraw the Reference").  The Motion to Withdraw the Reference argued that non-core matters were primarily involved, that the Defendant sought and was entitled to a jury trial, and that the Defendant did not consent to the bankruptcy court presiding over such matters.  The Defendant subsequently withdrew its motion to withdraw the reference.  [Doc. No. 54.]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant has established that the pleadings, affidavits, and other evidence available to the court demonstrate that no genuine issue as to any material fact exists, and the movant is, thus, entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006*); Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004). Material issues are those that could affect the outcome of the action. *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002). Stated differently, "[a] genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Piazza's Seafood World, LLC,* 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The court must view all evidence in a light most favorable to the non-moving party. *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891. Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The court shall not weigh the evidence or evaluate the credibility of the witnesses. *Anderson*, 477 U.S. at 255. But when the "evidentiary facts are not

12

disputed," a court may grant summary judgment "if trial would not enhance its ability to draw inferences and conclusions." *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1124 (5th Cir. 1978). If the movant satisfies its burden, the non-movant must then come forward with specific evidence to show that there is a genuine issue of fact. *Lockett,* 337 F. Supp. 2d at 891; *see also Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir. 1993). The non-movant may not merely rely on conclusory allegations or the pleadings. *Lockett,* 337 F. Supp. 2d at 891. Rather, it must demonstrate specific facts identifying a genuine issue to be tried in order to avoid summary judgment. Fed. R. Civ. P. 56(e); *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891. Thus, summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). Here, the court concludes that Defendant has met its burden of demonstrating that no genuine issue of material fact exists as to Counts One, Four, Five, Six, and Seven, and the Defendant is, thus, entitled to judgment as a matter of law on these counts. However, Defendant has not met its burden of demonstrating that no genuine issue of material fact exists as to Count Twelve, so this Count must go to trial. The court further concludes that Plaintiffs have failed to meet their burden of demonstrating that no genuine issue of

13

material fact exists as to Counts Two and Three, so these Counts must go to trial.

## A.   Count One: Violation of 12 U.S.C. § 2605(g).

The Defendant has sought summary judgment on Count One of the Plaintiffs' Amended Adversary Complaint ("Complaint"), which is a claim that Defendant allegedly violated Section 2605(g) of title 12 of the United States Code, which title is known as the Real Estate Settlement Procedures Act or "RESPA."  12 U.S.C. § 2605(g).  Hereinafter, the court will refer to this as the "RESPA Claim."  This particular statute in RESPA requires that a servicer of a "federally related mortgage," who is required by the terms of the loan to make property-tax payments on the mortgagor's behalf from an escrow, make such payments in a "timely manner."  Specifically, the statute reads:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.

11 U.S.C. § 2605(g).

The Defendant has argued that no genuine issue as to any material fact exists with regard to this alleged statutory violation, because there is no summary judgment evidence (or even an allegation, for that matter) that the Defendant did not make

14

"timely" payments on Plaintiffs' behalf.  Rather, the Plaintiffs
are complaining that the Defendant advanced taxes to taxing
authorities when it **should not have** and, essentially, set up an
unnoticed escrow account for taxes when it should not have (*i.e.,*
the Plaintiffs allege that they themselves were paying their
taxes, so certain payments that the Defendant made to the Tarrant
County taxing authorities for alleged deficiencies were
inappropriate).  Note that there was a waiver in place between
the Defendant and Plaintiffs from the time that the mortgage loan
was originated, pursuant to which the parties agreed there would
be no procedure in place for an escrow of taxes in connection
with the loan (and this waiver could, at Defendant's option,
become null and void if Plaintiffs were in default on their
loan).  *See* Def. Ex. B.

Plaintiffs now concede that "given the evidence developed,
they are unable to maintain their cause of action for damages
under 12 U.S.C. § 1205(g)."  Plaintiffs' Response to MSJ, p. 2,
n.1.  Thus, summary judgment in Defendant's favor on the RESPA
Count is appropriate and will be granted.  However, the
Plaintiffs have argued in their Response that they nevertheless
believe that Defendant has still violated certain other
provisions of RESPA, by essentially setting up an escrow
regarding taxes and failing to provide proper notice of escrow
advances and alleged shortages/deficiencies in the escrow (citing

12 U.S.C. § 2609(b) and 24 C.F.R. § 3500.17(f)(5); this statute
and regulation requires a mortgage servicer advancing escrow
accounts to notify "the borrower at least once during the escrow
account computation year if there is a shortage or deficiency in
the escrow account"). Plaintiffs state that Defendant "should be
precluded from any attempt to recover the unnoticed arrearages it
presently seeks to collect" with regard to the taxes Defendant
paid. *See* Plaintiffs' Response to MSJ, pp. 23-24.

To be clear, Plaintiffs have not currently articulated in
their Complaint any counts for relief for violations of RESPA
other than violations of 12 U.S.C. § 1205(g)—which statute they
now concede is inapplicable. Plaintiffs—if this is their
intention—cannot attempt to assert a new RESPA claim through an
opposition to a motion for summary judgment. The court will not
treat Plaintiffs' opposition to the Defendant's motion for
summary judgment as a motion for leave to amend. Thus, summary
judgment for Defendant is granted on the RESPA Count and no
violations of RESPA are currently at issue in this Adversary
Proceeding as currently framed.

**B. Count Four: Negligence.**

The Defendant has sought summary judgment on Count Four of
the Plaintiffs' Complaint, which is a claim that Defendant was
negligent in the manner in which it performed its duties in
servicing Plaintiffs' loan in that it: (a) failed to properly

16

apply payments made by Plaintiffs; (b) demanded payment of monies not properly due; (c) failed to correct its bookkeeping errors that caused it to show arrearages where none were due; and (d) initiated a foreclosure based at least in part on Plaintiffs' failure to remit amounts not actually owed. Defendant argues that to succeed on a negligence claim under Texas law, a plaintiff must prove that a defendant owed it a legal duty and breached such duty causing plaintiff to suffer damages. Defendant further argues that under Texas law, there exists no special relationship between a mortgagor and mortgagee giving rise to a legal duty upon which a negligence claim may be based. And, more specifically, a mortgage servicer owes no duty **other than contractual duties** (*i.e.,* to collect and apply payments in accordance with the mortgage contract). While the court believes that Defendant has not properly framed its argument, the court nevertheless agrees with Defendant that Plaintiffs' negligence claim fails as a matter of law and summary judgment for the Defendant is proper.

### 1. The Elements of Simple "Negligence."

First, under long-established Texas law, the elements of a negligence claim are: (a) a legal duty owed by one person to another; (b) breach of that duty; and (c) damages proximately caused by the breach. *E.g., Nabors Drilling, U.S.A., Inc. v. Escoto,* 288 S.W.3d 401, 404 (Tex. 2009); *Lane v. Halliburton,* 529

17

F.3d 548, 565 (5th Cir. 2008). Thus, "duty" is the threshold question in connection with any negligence claim. *Pichardo v. Big Diamond, Inc.*, 215 S.W.3d 497 (Tex. App.-Fort Worth 2007, no pet.). If there is no existence and violation of a legal duty, then there can be no legal liability for negligence. *Alcoa, Inc. v. Behringer*, 235 S.W.3d 456, 459 (Tex. App.-Dallas 2007, pet. denied). And a "duty" is a legal obligation that requires a defendant to conform to a certain standard of conduct. *San Benito Bank & Trust Co. v. Landair Travels,* 31 S.W.3d 312, 317 (Tex. App.-Corpus Christi 2000, no pet.); *Wheaton Van Lines, Inc. v. Mason*, 925 S.W.2d 722, 729 (Tex. App.-Fort Worth 1996, writ denied) (duty represents a legally enforceable obligation to conform to a particular standard of conduct). Note that where there is a contract between the parties, the duty must arise independently of the fact that a contract exists between the parties (*i.e.,* there must be an independent obligation/duty imposed by law). *Am. Nat'l Ins. Co. v. IBM Corp.*, 933 S.W.2d 685, 686 (Tex. App.-San Antonio 1996, writ denied). In other words, a contractual relationship between parties may create duties under **both** contract and tort law. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (the "nature of the injury" most often determines whether a contract duty or duty-imposed-by-law is breached; when "the injury is only the economic loss to the subject of a contract itself, the action sounds in

18

contract alone"). A plaintiff carries the burden of proving the existence and violation of an independent obligation imposed by law. *Am. Nat'l Ins. Co.*, 933 S.W.2d at 686; *Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471 (Tex. App.-Houston [1st Dist.] 2007, pet. denied).

## 2. Duty or No Duty?

In the case at bar, the parties have focused almost exclusively on duty. And, unfortunately, there is little guiding authority to enlighten this court as to whether there is a recognized duty to conform to a certain standard of conduct that might: (a) be owed from a mortgage lender or servicer to its borrower; and (b) give rise to a negligence claim. Negligence has been defined as a failure to use **ordinary or due care**; that is, failing to act as a person of ordinary prudence would have acted under the same or similar circumstances. *Webb v. Glenbrook Owners Ass'n, Inc.,* 298 S.W.3d 374, 388 n.6 (Tex. App.-Dallas 2009, no pet.). But there must be a legally cognizable duty recognized (by statute or common law) before actions should be analyzed under the reasonably prudent person test.[10]

In a lender/servicer-borrower context, there is authority (cited by the parties, here) that addresses the duty, if any, of "**good faith and fair dealing**"—holding that there is none owed in

---

[10] Note that where a **statute** imposes a duty/standard of conduct, breach of the duty would fall into the category of what is known as negligence *per se*.

this context. *E.g., White v. Mellon Mortg. Co.*, 995 S.W.2d 795, 800 (Tex. App.-Tyler 1999, no pet.) ("Mellon's obligation as a servicer for MetLife is to collect the payments due under the note and deed of trust and disburse those monies as required by the underlying documents"; "The relationship between a mortgagor and mortgagee does not give rise to a duty of good faith"); *Everson v. Mineola Cmty. Bank, S.S.B.*, No. 12-05-00334-CV, 2006 WL 2106959, at *2-3 (Tex. App.-Tyler July 31, 2006, pet. denied) (relationship between mortgagor and mortgagee does not give rise to a duty of good faith and fair dealing). But breach of duty of good faith and fair dealing is a distinct tort from negligence, the latter of which implicates a breach of duty of due or ordinary care. *See Cole v. Hall*, 864 S.W.2d 563, 568 (Tex. App.-Dallas 1993, writ dism'd w.o.j.) (case involving an employee suit against an employer alleging, among other things, a claim for "breach of duty and good faith and fair dealing;" the court noted that such a claim is a tort that arises from an underlying contract and Texas law does not recognize an implied duty of good faith and fair dealing in every contract or business transaction but, rather, Texas courts have held that a "special relationship" is necessary to create a common law duty to act in good faith, such as that between an insurer and insured, principal and agent, joint venturers and partners). To be clear, Texas courts have specifically held that the "special relationship" necessary to

create a common law duty to act in good faith and with fair dealing does not apply to the relationship of mortgagor-mortgagee (*Lovell v. Western Nat'l Life Ins. Co.*, 754 S.W.2d 298, 302-3 (Tex. App-Amarillo 1988, writ denied)), and also not to that of lender-borrower (*Nance v. Resolution Trust Co.*, 803 S.W.2d 323, 332-33 (Tex. App.-San Antonio 1990), *writ denied*, 813 S.W.2d 154 (Tex. 1991) (per curiam); *White*, 995 S.W.2d at 801 (holding there is no special relationship giving rise to a "***fiduciary duty***" between a mortgage servicer and borrower; fiduciary duty claim was based on theory (which was ultimately rejected by the court) that payment of funds by the mortgagor into an escrow account for the mortgagee's use to meet tax and insurance obligations created a trust or fiduciary relationship under Texas law).

Despite the apparent nonexistence of a "special relationship" or fiduciary relationship *vis-a-vis* a mortgage servicer and borrower or lender and borrower under Texas law, this still begs the question of whether there is, nonetheless, a ***duty of ordinary or due care***, generally, or some other duty/obligation to conform to a particular standard of conduct. For, clearly, as argued by the Defendant, in order to impose negligence-liability with respect to a particular person, there must be a violation of a duty owed by that very person to another particular person. *Abalos v. Oil Dev. Co. of Texas*, 544 S.W.2d 627, 631 (Tex. 1976). There is simply no duty to act reasonably

21

toward others generally. *THPD, Inc. v. Cont'l Imps., Inc.,* 260
S.W.3d 593, 616 (Tex. App.-Austin 2008, no pet.). Examples of
relationships that have been recognized in Texas common law as
giving rise to a legal duty include: (a) that between
manufacturers or suppliers of a product, on the one hand, and
users, on the other (*Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588,
591 (Tex. 1986)); (b) that between one supervising or maintaining
control over another and the controllee, such as
employer/employee, parent/child, and independent
contractor/contractee under special circumstances (*THPD,Inc.*, 260
S.W.3d at 616; *San Benito Bank & Trust Co.*, 31 S.W.3d at 319);
(c) a premises owner owes a duty to invitees, to protect them
from certain risks (*Id.* at 318); and (d) persons who create a
dangerous situation or hazard owe a duty to prevent injuries to
others generally (*Id.* at 319). Moreover, "there are some cases
in which a duty exists as a matter of law because of a special
relationship between the parties." *Golden Spread Council, Inc.*
*No. 562 of Boy Scouts of America v. Akins,* 926 S.W.2d 287, 292
(Tex. 1996). "In such cases, the duty analysis ends there.
However, in most negligence cases a special relationship does not
exist"; in other words, there does not need to be a special
relationship for a duty to exist for negligence purposes. *Id.*
Finally, while people do not owe a duty to act reasonably towards
all other persons generally, it is still true that every person

22

has a duty to exercise reasonable **care** to avoid a **foreseeable risk** of injury to others. *DeGrate v. Exec. Imprints, Inc.,* 261 S.W.3d 402, 409 (Tex. App.- Tyler 2008, no pet.).

In any fact situation, case law has established that "duty" for negligence purposes is a pure question of law for the court to decide. *Pichardo,* 215 S.W.3d at 501. And where there has been no clear legal duty created under case law, the court should decide the legal duty question **based upon the facts surrounding the event in question**. *Id.* The surrounding facts that should be considered include: risk, foreseeability, and likelihood of injury—each balanced against the social utility of a defendant's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *E.g., Golden Spread Council, Inc. No. 562 of Boy Scouts of America,* 926 S.W.2d at 289. Thus, there is a risk-utility balancing test. *DeGrate,* 261 S.W.3d at 409. Of all these factors to balance, the foremost consideration is whether the risk of injury is foreseeable. *Id.* Foreseeability for purposes of establishing a legal duty in a negligence case means that the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligence created. *Alcoa, Inc.*, 235 S.W.3d at 460.

**3. The Real Issue: Damages.**

Distilling all of the cited Texas authority to its essence,

23

it appears to this court that, in order to determine whether the Defendant might have had a legal duty here that might create the possibility of negligence-liability, the court would have to evaluate whether there was a foreseeable risk of injury to the Plaintiffs, as well as the burden to the Defendant of guarding against the injury, the consequences of placing the burden on Defendant, and the social utility of Defendant's conduct.

But here, despite the way the parties have framed the arguments, the court believes there is no need to tackle these factors relative to "duty." Here, there is a more significant reason that the negligence claim fails as a matter of law—and it has nothing to do with "duty." Here, Mr. and Mrs. Thrash have put forth no summary judgment evidence of any damages suffered *other than alleged economic harm and mental anguish/anxiety*. To be entitled to damages for negligence, a party must plead and prove something more than *mere economic harm*. *Blanche v. First Nationwide Mortg. Corp.*, 74 S.W.3d 444, 453 (Tex. App.-Dallas 2002, no pet.). In *Blanche*, the plaintiffs had purchased a home and assumed a promissory note on which the former home owners were liable. *Id.* at 459. Later, the Internal Revenue Service put a lien on the home for taxes owed by the former owners, and it was ultimately determined that there had been an invalid transfer of the home to the Blanches. *Id.* When the Blanches stopped paying on the promissory note because of the ruling

24

regarding the invalid transfer, the payee on the note reported the Blanches as delinquent to credit bureaus—allegedly causing the Blanches to be denied credit and other adverse economic consequences and also causing them mental anguish and emotional distress. *Id.* at 444-45, 453. Without addressing the duty issue, the court held that the Blanches' negligence claim asserted against the payee on the note (asserting negligence in the handling of the account and in reporting inaccurate information to the credit bureaus) failed as a matter of law because no evidence of anything other than mere economic harm was put forward. *Id.; See also City of Tyler v. Likes*, 962 S.W.2d 489, 496-98 (Tex. 1997) (homeowners could not recover for ***mental anguish*** resulting from damage to real and personal property; the court gave a detailed history and analysis as to when mental anguish is and is not compensable under Texas law—summarizing it as only compensable if there is: (a) ***intent or malice*** on the part of the defendant; (b) ***serious bodily injury*** to the plaintiff; (c) a "***special relationship***" between plaintiff and defendant; or (d) a case involving injuries of such a ***shocking and disturbing*** nature that mental anguish is a highly foreseeable result, such as wrongful death cases and actions by bystanders for a close family member's serious injury; the court also cited a string of Texas Court of Appeals cases in which the courts have "repeatedly denied recovery in cases where . . . the plaintiffs' mental

25

anguish arose out of legal injuries involving the home and its contents").[11]

Turning to the Thrashes' Complaint and specific summary judgment evidence, they have testified in depositions that they have suffered two instances of economic harm. Specifically, Plaintiffs tried to refinance their home but were told by a mortgage lender that they were ineligible for refinancing because the Defendant reported them (to a credit bureau) as being many months behind on their mortgage. Pls. Ex. F, pp. 125-26. Plaintiffs have also testified that Plaintiffs financed an automobile purchase after their discharge and were informed that their interest rate was increased due to the delinquency reported by the Defendant to the credit bureaus. Pls. Ex. F, pp. 128-29. The Thrashes also more generally indicate mental and physical anguish by describing that "[t]he half-decade struggle to save

---

[11] *E.g., Phillips v. Latham*, 523 S.W.2d 19, 26-27 (Tex. Civ. App.-Dallas 1975, writ ref'd n.r.e.) (involving wrongful trustee's sale of plaintiffs' home when plaintiffs were not in default on deed of trust; see also *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 898-99 (Tex. App.-Dallas 2001, no pet.) (in affirming the trial court's granting of summary judgment in favor of a defendant on a negligence claim, the court explained that "[d]amages resulting solely from economic harm generally are not recoverable in simple negligence actions . . .[contrasting 'simple negligence' from other torts such as professional malpractice and negligent misrepresentation]. To be entitled to damages for negligence, a party must plead and prove either a personal injury or property damage as contrasted to mere economic harm. Among the policy reasons supporting this rule is the difficulty, if not impossibility, of placing a reasonable limit on a defendant's liability to those who suffer solely economic damages caused by a negligent action."); *See also Jim Walter Homes, Inc.*, 711 S.W.2d at 618 (when "the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone").

26

their house has caused Plaintiffs severe emotional and physical
stress.  Plaintiff James Thrash suffers from acute heart trouble
and a seizure-disorder, both of which are exacerbated by anxiety.
He has suffered and continues to suffer ongoing medical expenses,
physical pain, and mental anguish as a result of Ocwen's wrongful
acts.  . . .  [Mrs. Thrash] has suffered severe emotional
distress as a result of Ocwen's actions, battling depression and
anxiety, for which she has had no choice but to seek medical
treatment."  Complaint, ¶¶ 56-57.  No evidence of specific
medical bills or other proof of physical consequences was put
into the summary judgment record.  Lastly, Mrs. Thrash has
allegedly spent hundreds of hours gathering and transmitting
information, waiting on customer service phone lines, writing
letters, and consulting attorneys in her effort to protect her
family from a wrongful foreclosure.  While there is indeed some
summary evidence of those facts, the only damages argued are that
Mrs. Thrash "has suffered, and continues to suffer, emotional and
physical distress as a result of Ocwen's wrongful acts."
Complaint, ¶¶ 56-57.

     While the economic consequences may be real, and while the
anguish may be genuine, the case law in Texas clearly does not
allow a claim for negligence to proceed where there is only a
claim of mere economic damages and/or mental anguish.  Here,
despite all the argument as to "duty" in the pleadings, the

27

viability of the negligence claim really all boils down to damages. This court struggles with how a "negligence" claim might ever prevail in a suit by a borrower against lender (or mortgage servicer), since it is hard to conceive of how anything more than economic damages and mental anguish will ever be involved.[12] In any event, based on the foregoing, summary judgment shall be granted to the Defendant with regard to the negligence claim.

## C. Count Five: Gross Negligence.

The Defendant has sought summary judgment on Count Five of the Plaintiffs' Complaint, which is a claim that Defendant "acted with reckless, wanton and heedless disregard for the rights of the Plaintiffs" by its "failing to make any real effort to correct its mishandling of Plaintiffs' account," by "failing to ensure that Plaintiffs were not needlessly injured by its mistakes," and by "threatening Plaintiffs with the loss of their most valuable asset without justification." Complaint, ¶ 80. This allegedly caused Plaintiffs to suffer "personal and financial damages."

Under Texas law, "gross negligence" is a heightened form of "negligence" that requires proof (in addition to the ordinary

---

[12] The court notes that there are certainly other torts where mere economic harm can be sufficient damages to establish liability. For example, pecuniary harm/damages are sufficient to establish a viable claim for negligent misrepresentation. *See discussion* in Section III.D., *infra*.

elements of negligence) of: (1) an act or omission that, viewed objectively from the actor's standpoint, involved "an extreme degree of risk;" and (2) the actor had actual, subjective awareness of the risk and proceeded, nevertheless, with a "conscious indifference." *Lane*, 529 F.3d at 565; *Guzman v. Inter Nat'l Bank*, No. 13-07-00008-CV, 2008 WL 739828, at *3-4 (Tex. App.-Corpus Christi March 20, 2008, no pet.). It seems obvious that if the Defendant is not entitled to summary judgment with regard to the negligence claim, then it is certainly not entitled to summary judgment on the "gross negligence" claim—as the latter encompasses more stringent elements of proof. If mere economic harm and mental anguish damages are not enough to sustain a simple negligence claim, then they also will not sustain a gross negligence claim. However, it is also noteworthy that there is no summary judgment evidence in the record that the Defendant's actions involved an "extreme degree of risk". *See Universal Servs. Co., Inc. v. Ung*, 904 S.W.2d 638, 641 (Tex. 1995) (extreme risk requires a showing of "likelihood of serious injury to the plaintiff"; a remote possibility of injury or even a high probability of minor harm will not support a gross negligence claim); *See also Guzman*, 2008 WL 739828, at *3-4 (lender's actions/non-disclosures that ultimately allegedly resulted in foreclosure on the plaintiff's house did not give rise to a gross negligence claim). As a matter of law, assuming every bit of

proof offered by Plaintiffs is true, the Defendant's actions did not rise to the level of creating an extreme "likelihood of serious injury" to the Plaintiffs. Once again, mere economic harm and mental anguish and anxiety are not sufficient under the law. *See* discussion in Section II.B.3 above.

**D.  Counts Six and Seven: Fraudulent and Negligent Misrepresentation.**

There is substantial overlap between Counts Six and Seven of the Plaintiffs' Complaint and, thus, the court will combine the discussion of these counts.

The Defendant has sought summary judgment on Count Six (the tort of fraudulent misrepresentation) and Count Seven (the tort of negligent misrepresentation), in which Plaintiffs assert that: (1) Defendant falsely represented to the Plaintiffs that they owed amounts on their mortgage loan that Defendant knew or should have known had either been paid by the Plaintiffs or were not properly owed; (2) Defendant falsely represented to Plaintiffs that failure to pay such amounts would give the Defendant the right to foreclose on Plaintiffs' home; (3) the misrepresentations involved matters that were material and central to the relationship between Defendant and Plaintiffs (namely, the amount of money owed and the manner, method, and date upon which payments on said amounts were to be made, and potential consequences of non-payment); (4) Defendant knew or should have known these representations were false (or, in making

30

said misrepresentations, the Defendant failed to exercise the degree of diligence, care and expertise that the Plaintiffs were entitled to expect); (5) Plaintiffs justifiably relied on the alleged misrepresentations (in that Defendant had sole access to Plaintiffs' account records); and (6) Plaintiffs have suffered personal and financial damage as result of their reliance.

   **1.   Elements of Fraudulent and Negligent Misrepresentation.**

   First, the elements of the tort of *fraudulent misrepresentation* under Texas law are: (1) a material representation was made; (2) it was false; (3) it was known to be false when made or was recklessly made without knowledge of its truth; (4) it was intended to be relied upon; (5) it was relied upon; and (6) it caused injury. *Larsen v. Carlene Langford & Assocs.*, 41 S.W.3d 245, 249 (Tex. App.-Waco 2001, pet. denied). Second, the elements of the tort of *negligent misrepresentation* under Texas law are: (1) a defendant provided information in the course of his business, or in a transaction in which defendant had a pecuniary interest; (2) the information supplied was false; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relied on the information; and (5) the plaintiff suffered damages proximately caused by the reliance. *Id.*[13]

---

[13] The second prong of negligent misrepresentation has sometimes been differently phrased as "the defendant supplie[d] false

31

The elements of fraudulent and negligent misrepresentation are virtually identical except, of course, that in the case of negligent misrepresentation, a mere lack of care with regard to information supplied (as opposed to knowledge of falsity or recklessness) is sufficient to establish culpability. Note that negligent misrepresentation claims frequently arise when the parties have a relationship, but the plaintiff need not prove privity of contract. *Jeffries v. Pat A. Madison, Inc.*, 269 S.W.3d 689, 691 (Tex. App.-Eastland 2008, no pet.) (citing *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 234 (Tex. App.-Dallas 1985, writ ref'd n.r.e)). Moreover, the duty to avoid making a negligent misrepresentation can arise in a relationship even if the parties' relationship does not give rise to a duty in connection with certain other torts. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 795 (Tex. 1999) (the negligent misrepresentation tort is separate and distinct from the professional malpractice tort, thus a non-client of an attorney had a viable claim against the attorney for his negligence misrepresentations on which the non-client may have justifiably relied, despite lack of privity). Finally, in the case of negligent misrepresentation (unlike the negligence

---

information for the guidance of others in their business," and the fourth and fifth prongs have sometimes been differently phrased as "the plaintiff suffer[ed] pecuniary loss by justifiably relying on the representation." *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

tort, discussed earlier) an economic or pecuniary loss suffered by a plaintiff, in reliance on the defendant's actions, is sufficient to sustain a claim.  *Sloane*, 825 S.W.2d at 442-43 (Tex. 1991); RESTATEMENT (SECOND) OF TORTS § 552B (2010).

## 2.  Mistakes Were Made—But Where is the Detrimental Reliance?

The specific details of the Complaint and summary judgment evidence related to Counts Six and Seven are that Plaintiffs received certain letters from the Defendant stating that Plaintiffs owed arrearages that, in fact, were not all owed (hereinafter, the "Three False Notices").  Specifically:

> (a) on June 15, 2004, Plaintiffs received a Notice of Default from Defendant, stating that Plaintiffs owed Defendant $21,207.36 (Pls. Ex. K), which Defendant subsequently admitted was incorrect, in that it included prepetition amounts that were disallowed during the Plaintiffs' bankruptcy case;
>
> (b) on June 18, 2004, Plaintiffs received a second Notice of Default from Defendant, stating that Plaintiffs owed Defendant $20,466.95 (Pls. Ex. K), which Defendant subsequently admitted was incorrect, in that it included prepetition amounts that were disallowed during the Plaintiffs' bankruptcy case; and
>
> (c) on November 1, 2008, Plaintiffs received a new Notice of Default from Defendant, demanding that Plaintiffs pay Defendant $27,499.65 or face foreclosure (Pls. Ex. O), which Defendant subsequently admitted was incorrect, in that it included prepetition amounts that were disallowed during the Plaintiffs' bankruptcy case and perhaps other charges that were not collectible in light of the Plaintiffs' discharge in 2004.

33

Defendant argues that, even though misrepresentations were made in these Three False Notices, Plaintiffs' fraudulent and negligent misrepresentation claims fail as a matter of law because there is no summary judgment evidence suggesting any detrimental reliance. In other words, neither Count Six nor Count Seven can succeed unless Plaintiffs reasonably and justifiably relied on Defendant's Three False Notices and suffered injury as a result. Defendant points to the fact that Plaintiffs admit that they did not take any specific action or make any payments in response to (or in reliance upon) the Three False Notices because they believed or knew that the statements were false. Def. Ex. A, pp. 96-97; Def. Ex. G, pp. 34-35. *See Matis v. Golden*, 228 S.W.3d 301, 311 (Tex. App.-Waco 2007, no pet.) ("A plaintiff must 'demonstrate that he relied upon the fraudulent misrepresentation to his detriment.' Reliance is established by showing that the defendant's actions and representations induced the plaintiff 'to act or to refrain from action.' . . . Actual knowledge of false representations is 'inconsistent with the claim that the allegedly defrauded party has been deceived, and it negatives the essential element of reliance upon the truth of the representations'") (citations omitted). Indeed, Plaintiffs have not put forth any summary judgment evidence that they ever paid anything more than their regular monthly mortgage payments in response to the Defendant's

34

Three False Notices, and, specifically, did not pay any improperly asserted arrearages. Def. Ex. A at p. 103 (lines 3-9), p. 96 (line 4) through p. 98 (line 17), p. 123 (line 16) through p. 125 (line 3); Def. Ex. G, pp. 34-35 & pp. 37-39. In fact, the only action Plaintiffs allegedly took was attempting to work with Defendant to correct the alleged errors. Not only, Defendant argues, were there no real actions taken in reliance, but Plaintiffs allegedly suffered no pecuniary damage, having paid nothing as a result of the misstatements in the Three False Notices.

In order to succeed on a cause of action of fraudulent or negligent misrepresentation, Plaintiffs, indeed, must show justifiable and reasonable reliance on the representations in the Three False Notices and that injury was suffered as a result. *See Ortiz v. Collins,* 203 S.W.3d 414, 423 (Tex. App.-Houston [14th Dist.] 2006, no pet.) (justifiable and reasonable reliance is a necessary element of a claim for fraudulent misrepresentation); *Larsen*, 41 S.W.3d at 249-50 (justifiable reliance is a necessary element of a claim for negligent misrepresentation); *Solano v. Landamerica Commonwealth Title of Fort Worth, Inc.*, No. 2-07-152-CV, 2008 WL 5115294, at *9-10 (Tex. App.-Fort Worth Dec. 4, 2008, no pet.) (affirming summary judgment where no evidence of detrimental reliance).

The court must agree with the Defendant that Plaintiffs have

35

failed to put forward any summary judgment evidence of detrimental reliance.  Here, certainly other elements of these torts appear to be established (*e.g.,* representations were made by the Defendant in the course of a business relationship, the representations were false, and the information was intended to be relied upon (or was at least supplied to Plaintiffs for guidance)).  And it does not matter whether there was actually privity of contract between the Plaintiffs and the mortgage servicer Defendant.  And it does not matter if any damages were merely of an economic nature (unlike with simple negligence).  But where is the detrimental reliance here on the notices?

As the Defendant has pointed out, the Plaintiffs testified that they made no extra payments beyond their regular mortgage payments as a result of the Three False Notices described above.  Def. Ex. A at p. 103 (lines 3-9), p. 96 (line 4) through p. 98 (line 17), p. 123 (line 16) through p. 125 (line 3); Def. Ex. G, pp. 34-35 & pp. 37-39.[14]  The Plaintiffs have asserted in their

---

[14] Since the court has determined that there is no summary judgment evidence of detrimental reliance in the case at bar, the question of whether there was "reasonable and justifiable" reliance is moot.  If it were not, though, this would be a difficult, fact-intensive call, and the matter would probably have to go to trial.  *See Ortiz*, 203 S.W.3d at 421-22 (court held that plaintiff, who was evicted from a town home after a foreclosure sale, and who sued an attorney for the purchasers at the foreclosure sale for his allegedly negligent misrepresentation that the purchasers would not evict the plaintiff from the town home pending negotiations for the plaintiff's possible re-purchase of the property, had not established as a matter of law fraud, negligent, misrepresentation, and promissory estoppel claims).  Specifically, the court in *Ortiz* noted that "as a matter of law, reliance on any alleged misrepresentations is unjustified in this

Complaint that "[t]he half-decade struggle to save their house has caused Plaintiffs severe emotional and physical stress. Plaintiff James Thrash suffers from acute heart trouble and a seizure-disorder, both of which are exacerbated by anxiety. He has suffered and continues to suffer ongoing medical expenses, physical pain, and mental anguish as a result of Ocwen's wrongful acts. . . . [Mrs. Thrash] has suffered severe emotional distress as a result of Ocwen's actions, battling depression and anxiety, for which she has had no choice but to seek medical treatment." Complaint, ¶¶ 56-57. But no evidence of specific medical bills or other proof of physical consequences was put into the summary judgment record. The Plaintiffs have also alleged that Mrs. Thrash has spent hundreds of hours gathering and transmitting information, waiting on customer service phone lines, writing letters and consulting attorneys in her effort to protect her family from a wrongful foreclosure. While there is indeed some summary evidence that Mrs. Thrash has made many efforts (phone calls and letters) to question the numbers in the

---

case because all representations were made in an adversarial context. . . . Generally, reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context, such as litigation." *Id.* at 422 (citing *McCamish*, 991 S.W.2d 787 at 794). The *Ortiz* court added that "'[a] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party.'" *Ortiz*, 203 S.W.2d at 422 (citing *Coastal Bank SSB v. Chase Bank of Tex., N.A.*, 135 S.W.3d 840, 843 (Tex. App.-Houston [1st Dist.] 2004, no pet.)).

Three False Notices, there is no summary judgment evidence of actual damages suffered.

The Plaintiffs have, indeed, testified that they have suffered two instances of economic harm as a result of the Defendant's **conduct**. Specifically, Plaintiffs testified in depositions that they tried to refinance their home but were told by a mortgage lender that they were ineligible for refinancing because the Defendant reported them (to a credit bureau) as being many months behind on their mortgage. Pls. Ex. F, pp. 125-26. Plaintiffs have also testified in their depositions that Plaintiffs financed an automobile purchase after their discharge and were informed that their interest rate was increased due to the delinquency reported by the Defendant to the credit bureaus. Pls. Ex. F, pp. 128-29. But, assuming this is true, there is nothing in the summary judgment record to tie this alleged denial of credit **to the Three False Notices**. Moreover, assuming this is true, the alleged injuries (denial of credit to the Thrashes at favorable rates) certainly would not have resulted from any **reliance by Plaintiffs** on the Three False Notices (but, rather, a reliance by **third-party consumer lenders** on a **credit report** which—by the way—is not in evidence).

### 3. The Earlier Allegedly False Notices.

The court notes, finally, that the Plaintiffs have newly argued in the Plaintiffs' Response to MSJ that this Adversary

38

Proceeding is not simply about the Three False Notices—which, the Plaintiffs admit, did not cause them to make extra payments beyond their regular mortgage payments. The Plaintiffs now argue that there were actually some *earlier* false demand notices (hereinafter, the "Earlier Allegedly False Notices") about which they are also complaining, and the Plaintiffs did, indeed, detrimentally rely upon them by making immediate (and presumably unnecessary or inflated) payments.[15] As further explained below, these Earlier Allegedly False Notices, unlike the Three False Notices, would have been well before the Plaintiffs' discharge and well before the Defendant filed a Notice of Termination of Stay on the June 14, 2004. *See* Plaintiff's Response to MSJ at ¶¶ 26-27; 35-36; 39-40; and p. 22, first full unnumbered paragraph. As described more fully below, there is no real summary judgment evidence to support the notion that these Earlier Allegedly False Notices were sent, were received, were false, and were detrimentally relied upon by the Plaintiffs. Moreover, there is likely an issue-preclusion problem confronting Plaintiffs—and maybe even a statute of limitations problem—with regard to complaining about these Earlier Allegedly False Notices.

---

[15] The court refers to this as a newly argued theory because, during depositions of Mr. and Mrs. Thrash, it arguably seemed as though they were testifying that the Three False Notices were the only ones about which the Plaintiffs were complaining. Def. Exs. A & G.

Specifically, the Plaintiffs have alleged in their Response to MSJ that Pls. Ex. J—which is a "comment log" internally generated by Defendant—showing account activity regarding the Plaintiffs' mortgage loan, reflects: (a) that Defendant (or its representatives) sent default notices to Plaintiffs on or about March 27, 2001, November 7, 2003 and April 4, 2004, alleging that Plaintiffs were behind on their mortgage loan; and (b) that Plaintiffs made payments to the Defendant shortly after these default notices were sent.  Plaintiffs presumably believe that the court can and should make an inference that the default notices referenced in the comment logs were sent, were received, and made false demands for amounts not truly due.  Plaintiffs presumably also believe that the court can and should make an inference that the payments that Plaintiffs are shown to have made in the comments log were made in reliance on the default notices and reflected inflated payments.  However, all that is in the summary judgment record is this very cryptic comments log. Pls. Ex. J.  The Plaintiffs have put forward no summary judgment evidence that these three default notices mentioned in the comment logs were, in fact: (1) sent; (2) received, and (3) false.  Not only are these Earlier Allegedly False Notices ***not*** themselves in the summary judgement evidence, but—assuming they exist, were sent, and were received—the comment logs to which the

40

Plaintiffs refer (if one looks at them really carefully)[16]
suggest that these were simply default notices regarding **regular**
mortgage payments that the Plaintiffs missed postpetition and
pre-discharge and/or regarding cure payments owed pursuant to the
Agreed Stay Order (*i.e.*, the comment logs do not describe default
notices of alleged escrow shortages, late charges, or other
amounts disallowed in the Defendant's proof of claim).  Further
sifting through the comment logs, it appears that the only
"immediate payments" Plaintiffs made after the dates of these
alleged default notices were in the amounts of these regular
mortgage payments missed (and/or for the cure payments owed
pursuant to the Agreed Stay Order).  *See* Pls. Ex. J, p. 21 of 21
(line 4); p. 20 of 21 (line 21); p. 18 of 21 (line 6 and above);
p. 17 of 21 (line 8 through end); p. 16 of 21 (lines 13-15).  *See*
*also* Ex. R to Complaint (a demonstrative aid prepared by
Plaintiffs, with attachments, showing payments sent by Plaintiffs
via Western Union, from August 29, 2003 through November 4,
2008).  Interestingly, Ex. R to the Complaint indeed shows some
delays in payments by Plaintiffs around the same time that the
Earlier Allegedly False Notices were sent, and also reflects
(through the attachments) an absence of any evidence of payments
by Plaintiffs other than regular mortgage payments and payments

---

[16] The call logs appear to be in approximately 4-point font and
are full of abbreviations and shorthand.

owed in connection with the Agreed Stay Order.

The Plaintiffs may not merely rely on conclusory allegations in their pleadings. *Lockett*, 337 F. Supp. 2d at 891 (E.D. Tex. 2004). Rather, the Plaintiffs must demonstrate specific facts identifying a genuine issue to be tried in order to avoid summary judgment. Fed. R. Civ. P. 56(e); *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891. The Plaintiffs simply have not made a showing sufficient to establish the existence of an element essential to their fraudulent and negligent representation counts. They have not put forward evidence of detrimental reliance causing damages with respect to the Three False Notices. And they have not even created a genuine issue of fact that ***false*** statements may have been made with respect to the Earlier Allegedly False Notices.

The Defendant has argued essentially that, even if there were a scintilla of evidence that the Earlier Allegedly False Notices were sent, received, were false and were detrimentally relied upon, the Plaintiffs are barred from complaining of these by either doctrines of *res judicata* (in that there was no objection raised to the June 14, 2004 Notice of Termination of Stay that was filed in the Bankruptcy Court by the Defendant prior to the discharge order and/or prior to case closure) and also by the statute of limitations—there being approximately six-to-nine years that elapsed between the time of these Earlier

42

Allegedly False Notices and the filing of the Adversary
Proceeding in which Plaintiffs now complain about them. The
Defendant may very well be correct (*i.e.,* it would appear that
any issues that could have been raised at the time of the filing
of the June 14, 2004 Notice of Termination could and should have
been raised in the form of a timely challenge to that Notice).
But the court has no need to decide these issues (issues, by the
way, that were not briefed by the parties). Rather, based upon
all the foregoing, summary judgment will be granted for
Defendants in connection with Counts Six and Seven, due to
failure to put forth summary judgment evidence of justifiable,
reasonable, and detrimental reliance.

**E. Count Twelve: Unreasonable Collection Efforts.**

The Defendant has sought summary judgment on Count Twelve,
in which Plaintiffs assert that Defendant is liable to Plaintiffs
for a common law tort of "unreasonable collection efforts."
Plaintiffs specifically state that the Defendant's collection
efforts toward Plaintiffs were "unreasonable and wrongful," and
Plaintiffs have a right to be free from unreasonable and wrongful
collection efforts. Plaintiffs cite *Moore v. Savage,* 359 S.W.2d
95 (Tex. Civ. App.–Waco 1962), *writ ref'd n.r.e.*, 362 S.W.2d 298
(Tex. 1962) (per curiam). In urging that Count Twelve should be
denied as not raising a genuine issue of material fact and that
it is entitled to summary judgment as a matter of law, Defendant

43

argues that an unreasonable collection efforts claim would require harassing and abusive conduct.  The Defendant argues that the conduct that is presented in the Plaintiffs' summary judgment evidence does not rise to that level as a matter of law.

A review of the summary judgment evidence presented by the Plaintiffs reflects deposition testimony of Mrs. Thrash that mentions, among other things, that in "phone calls we would have with them [Defendant] trying to straighten it out . . . they would tell us how incompetent we were and why wasn't my husband working to pay his bills.  Pretty demeaning statements saying we were, in fact, deadbeats."  Def. Ex. A, p. 99 (lines 15-20). Mrs. Thrash also testified that Defendant-representatives did "yell" at her (she estimated when questioned that it happened between one and ten times on phone calls).  Def. Ex. A, p. 101 (lines 1-12).  She testified that two gentlemen, on one occasion, came to the Thrashes' home unannounced to look at the home to see if they wanted to buy it, saying they were informed by the Defendant that the homestead was vacant and open.  Def. Ex. A, p. 98 (lines 22-25) & p. 101 (lines 13-25).

Mr. Thrash's deposition testimony corroborated the same story about the two gentlemen visitors.  Def. Ex. G, p. 59 (lines 5-23).  Mr. Thrash also testified in his deposition that on one occasion, a Defendant-representative said, "I hope you're taking better care of your kids than you are your house payments and

44

your financial responsibilities." Def. Ex. G, p. 51 (lines 7-
10).  Mr. Thrash testified that he talked to the Defendant
numerous times and "all I got was discourteous talk of how I need
to be paying my bills on time, being up on my bills, be more of a
man to take care of my family."  Def. Ex. G, p. 56 (line 24)
through p. 57 (line 3).  Mr. Thrash testified that the Defendant
"threatened to throw my family and my kids out on the street."
Def. Ex. G, p. 60 (lines 2-3).  Mr. Thrash also suggested without
elaboration that a Defendant-representative may have used
profanity with him.  *See* Pls. Ex. L, p. 48 (lines 1-6) (in
response to Defendant's lawyer asking Mr. Thrash if Mr. Thrash
had used obscenities on the phone with Defendant).

The Defendant argues that the case law uniformly holds that
conduct sufficient to sustain an unreasonable collection efforts
claim involves threats, repeated phone calls and personal visits
at all hours of the day and night, as well as repeated conduct
with friends, family members, and co-workers.  Essentially, the
Defendant argues that Plaintiffs have not pled or provided
summary judgment of collection efforts that were outrageous or
harassing-enough to be actionable.  Defendant points out that
Plaintiffs have not testified as to any physical threats (only
threats of foreclosure and putting the Plaintiffs' kids out on
the street), nor have they complained of phone calls late-at-
night or at the work place, contacts with family and friends, or

45

visits from Defendant-representatives (other than, perhaps, the two gentleman who said they had heard from the Defendant that the house was foreclosed, vacant, and was available).

Obviously, a tort like unreasonable collection efforts is highly fact intensive. And, obviously, it may largely boil down to the credibility of witnesses in a "he said-she said" type of scenario, with not a lot of documentary or other corroborating evidence. Possibly there could be recordings of phone conversations available in this case at a trial before a fact-finder—although the summary judgment papers and evidence are silent on this point. In any event, the court is required to accept as true the summary judgment evidence of the Thrashes (that demeaning comments, yelling, and perhaps profanity took place on phone calls). The court is required to accept as true that two gentlemen showed up early one morning at the Thrashes' house wanting to look at the house. While there is no testimony that the two gentlemen carried baseball bats or brass knuckles, this court also must accept as true that Mr. Thrash is disabled with a serious heart condition and that there are children in the house. And all of the phone calls and contacts and the gentlemen-visit (whatever their tone) happened against a backdrop of Three False Notices that Defendant admits had some significant level of incorrect arrearages contained therein. Again, the tort of unreasonable collection efforts is ***highly fact intensive***.

46

Clearly, here the non-movant (Plaintiffs) have put forth specific summary evidence to show that there is a genuine issue of fact as to harassment and unreasonable collection acts.  A trier of fact needs to see these witnesses, hear these witnesses, and decide, accordingly, whether conversations and other contacts were so unreasonable here such that liability and damages should be assessed.  For this reason, Defendant's request for summary judgment is denied.  Count Twelve must go to trial.

**F.  Counts Two and Three: Alleged Violation of the Automatic Stay (11 U.S.C. § 362(a)) and Alleged Contempt of the Confirmation Order and Discharge Order (11 U.S.C. § 105).**

Finally, the court gets to what it considers to be "the real issue" in this Adversary Proceeding—despite there being twelve different counts and voluminous briefing on various tort theories.  Plaintiffs allege that Defendant's actions—inclusive of (1) misapplying payments to disallowed prepetition claims, (2) establishing undisclosed postpetition escrow advances not approved by the court, (3) assessing late charges and other charges for which Defendant never sought or obtained court approval, and (4) ultimately sending demand or default notices with erroneously calculated arrearages charged to Plaintiffs' account—constituted violations of the automatic stay (to the extent the acts happened during the case), entitling Plaintiffs to actual and punitive damages.  Plaintiffs rely upon section 362(a)(6) of the Bankruptcy Code, which prohibits "any act to

47

collect, assess, or recover a claim against the debtor that arose
before the commencement of the case under this title." 11 U.S.C.
§ 362(a)(6). Moreover, Plaintiffs allege that Defendant's
actions—in (1) misapplying payments, (2) failing to adjust its
books to account for the bankruptcy, (3) assessing wrongful
charges made to the Plaintiffs' account, and (4) sometimes
putting regular mortgage payments in "suspense"—constituted
contempt of the confirmation order and discharge order and an
abuse of bankruptcy process, and warrant civil contempt
sanctions, pursuant to Section 105 of the Bankruptcy Code. The
Plaintiffs seek summary judgment on Counts Two and Three.

    As noted earlier in this opinion, the summary judgment
evidence established the following undisputed facts:

> (a) the Defendant accrued "late fees" every
> month, during the term of Plaintiffs'
> bankruptcy plan, even if the Plaintiffs
> timely made their plan payments and their
> regular postpetition mortgage payments, since
> the Plaintiffs were technically not
> "contractually current" (according to
> Defendant's corporate policy and the
> deposition testimony of Defendant's Rule
> 30(b)(6) representative; this corporate
> policy of accruing "late charges" is in place
> in the case of Chapter 13 debtors making
> postpetition regular mortgage payments *via*
> "direct pay," because so many chapter 13
> debtors default on their plans and have their
> cases dismissed and, in such events, the
> Defendant says it would be confusing to
> reinstate earlier reversed-out charges);[17]

---

[17] The Defendant's representative testified in a deposition that
its usual procedure (when there is a discharge of a debtor) is to

(b) the Defendant's bookkeeping practices
with regard to the Plaintiffs' loan account
were performed such that Defendant continued
to carry disallowed components of Defendant's
proof of claim on its books through the
bankruptcy case and thereafter, and, thus,
always showed the Plaintiffs to be behind in
their payments at least in this respect;[18]

(c) the Defendant erroneously applied, on
November 18, 2002 (*i.e.,* during the case),
$1,918.23 worth of **post**petition regular
mortgage payments paid in by the Plaintiffs
to Plaintiffs' negative "escrow account"
which was negative (at least in large part)
due to **pre**petition arrearages that had been
disallowed by the bankruptcy court in
connection with Plaintiffs' objection to the
Defendant's proof of claim;

(d) the Defendant erroneously applied, on
December 31, 2002 (*i.e.,* during the case),
$889.82 worth of **post**petition regular
mortgage payments paid in by the Plaintiffs
to Plaintiffs' negative "escrow account"
which was negative (at least in large part)
due to **pre**petition arrearages that had been
disallowed by the bankruptcy court in
connection with Plaintiffs' objection to the
Defendant's proof of claim;

(e) the Defendant sometimes applied
Plaintiffs' regular postpetition mortgage
payments to principal and interest and
sometimes posted them in a "suspense account"

---

perform a post-discharge audit or reconciliation and "reverse out"
these late charges, but it was not undertaken in this case, since the
automatic stay was terminated one month **prior** to the Plaintiffs'
discharge. See Pls. Ex. B, Deposition of Gina Johnson, p. 44.

[18] *See* Pls. Ex. B, Deposition of Gina Johnson, p. 13. *See also*
footnote 17, *supra*. No post-discharge audit/reconciliation to
eliminate prepetition claims that were disallowed was ever done in
this case, since the automatic stay was lifted in favor of the
Defendant one month **prior** to the Plaintiffs' discharge.

or applied them to "other charges" (the explanation of the Defendant is that the Plaintiffs sometimes sent in postpetition payments in the **_wrong amount_** and, when the Plaintiffs sent in a payment in the wrong contractual amount, the Defendant put the payment in a "suspense account" until the Plaintiffs had paid in the correct full amount that could be applied);

(f) because of postpetition payments being occasionally put in a "suspense account," there would be deemed-delays in payment, and this resulted in yet more late charges;

(g) the Defendant sometimes escrowed amounts for taxes and insurance when the mortgage loan did not contemplate this, and when the Plaintiffs allegedly have always paid taxes and insured the Homestead directly (the Plaintiffs, allegedly, have a special payment plan set up with the taxing authorities, due to Mr. Thrash being disabled);

(h) the Defendant coded the Plaintiffs' account so that broker price opinions were ordered roughly every six months at a cost of more than $100 each, and Plaintiffs argue that this was unwarranted; and

(i)  the above acts created a chain of events (all of which Plaintiffs argue were improper) that ultimately snowballed into numerous improper charges, fees, escrows and unjustified demands, and ultimately the attempted foreclosure.

The gist of all of this, Plaintiffs argue, is that the Defendant's actions violated the stay (to the extent the actions occurred pre-discharge), and contemptuously violated the confirmation order and discharge order (to the extent the actions occurred after those orders and contradicted the terms or spirit of those orders).

The Defendant labels some of these acts as mere accounting

50

errors or misallocations, and the Defendant denies that certain other acts were at all improper.

This court acknowledges that many opinions have been issued recently around the country regarding similar complaints being asserted by discharged debtors against their mortgage lenders. *See, e.g., Galloway v. EMC Mortg. Corp. (In re Galloway)*, Adv. No. 09-01124-NPO, 2010 WL 364336 (Bankr. N.D. Miss. Jan. 29, 2010) (Judge Olack); *Cano v. GMAC Mortg. Corp. (In re Cano)*, 410 B.R. 506 (Bankr. S.D. Tex. 2009) (J. Isgur); *Padillo v. Wells Fargo Home Mortg., Inc. (In re Padillo)*, 379 B.R. 643 (Bankr. S.D. Tex. 2009) (J. Isgur); *Payne v. MERS (In re Payne)*, 387 B.R. 614 (Bankr. D. Kan. 2008) (J. Berger); *Sanchez v. Ameriquest Mortg. Co. (In re Sanchez)*, 372 B.R. 289 (Bankr. S.D. Tex. 2007) (J. Bohm); *Jones v. Wells Fargo Home Mortg. (In re Jones)*, 366 B.R. 584 (Bankr. E.D. La. 2007) (J. Magner), *aff'd sub nom. Wells Fargo Bank, N.A. v. Jones*, 391 B.R. 577 (E.D. La. 2008). Some of these opinions reach different conclusions regarding whether a potential misapplication of postpetition payments implicates the automatic stay. *See Cano*, 410 B.R. at 524-25 (determining that GMAC's alleged improper allocation of postconfirmation mortgage payments may very well have violated the order confirming the plan but did not violate the automatic stay, because GMAC's only "act" with respect to "property of the estate" was the receipt and initial deposit of the Debtor's payments; once GMAC deposited

the payments into its own accounts, the funds ceased being "property of the estate"); *Padillo*, 379 B.R. at 664 (same); *Galloway,* 2010 WL 364336, at *5 (misapplication of payments received from the trustee under a chapter 13 debtor's confirmed plan might, in fact, constitute a violation of the automatic stay); *Payne,* 387 B.R. at 638 (court determined that mortgage lender violated the stay by applying trustee's payments under a chapter 13 plan to disallowed prepetition late fees, by refusing to remove disallowed fees, and by continuing to collect the disallowed late fees through payoff letters sent to the debtors); *Jones*, 366 B.R. at 600 ("Wells Fargo's failure to disclose other fees or request permission of the Court to seek their payment from estate property resulted in an illegal collection of fees not due from estate property and violated the automatic stay"); *Sanchez*, 372 B.R. at 313 (same); *See also Mann v. Chase Manhattan Mortg. Corp. (In re Mann),* 316 F.3d 1 (1st Cir. 2003) (bank's pre-confirmation and postpetition bookkeeping entries reflecting attorneys' fees and inspection fees being accrued during that time frame did not implicate the stay where no communications demanding payments of those amounts had occurred).

This court is of the view that alleged violations of the automatic stay and alleged contempt of court orders are (like "unreasonable collection efforts") ***intensely*** factual in nature. As stated earlier, the court must, in a summary judgment context,

view all evidence in a light most favorable to the non-moving party. *Piazza's Seafood World, LLC,* 448 F.3d at 752; *Lockett,* 337 F. Supp. 2d at 891. The court shall not weigh the evidence or evaluate the credibility of the witnesses. *Anderson*, 477 U.S. at 255. The court determines here that the Defendant has shown there are genuine issues of disputed facts that bear on whether they violated the stay or were in contempt of the confirmation and discharge orders. The trier of fact needs to hear **all pertinent details** regarding the corporate policies of the Defendant, as implemented with these Plaintiffs (and, specifically, what precise "late charges" were assessed against these Plaintiffs and when, what other charges for things like broker opinions were assessed, and when and why). The trier of fact also needs to hear detailed testimony (with documentation) regarding when taxes were paid by the Defendant and why—in order to determine whether tax escrows were justified or improper (this would include evidence as to whether Plaintiffs were really ever delinquent or not). The trier of fact also needs to hear exactly what postpetition mortgage payments were put in "suspense" and why. **The summary judgment evidence on all these points is less-than-clear and sometimes conflicting**. The parties, through selected deposition excerpts, a 4-point font call log that is not easily decipherable, and a small number of other documents, have not offered sufficient evidence to enable the court to determine

53

the extent of the misallocations, fees, and charges that are
potentially problematic and potentially violative of the
automatic stay, the confirmation order, and discharge order.
Summary judgment, therefore, on Counts Two and Three is improper.

### IV.  CONCLUSION AND ORDER

For the reasons set forth above, it is hereby

**ORDERED** that (a) Defendant's MSJ is **GRANTED** as to Counts
One, Four, Five, Six and Seven, and is **DENIED** as to Count Twelve;
and (b) Plaintiffs' Cross MSJ as to Counts Two and Three is
**DENIED** entirely.  It is further

**ORDERED** that this Adversary Proceeding will proceed to a
trial on the merits on the counts unresolved by this Memorandum
Opinion and Order (*i.e.,* Counts Two, Three, Eight, Ten, and
Twelve).

###END OF MEMORANDUM OPINION AND ORDER###